Citation Nr: 1542425 
Decision Date: 09/30/15 Archive Date: 10/05/15

DOCKET NO. 09-37 430 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Louis, Missouri


THE ISSUES

1. Entitlement to service connection for fibrosing mediastinitis.

2. Entitlement to service connection for a right thigh disability.

3. Entitlement to an initial disability rating in excess of 30 percent for migraine headaches including migraine variants. 


REPRESENTATION

Appellant represented by: Chisholm Chisholm & Kilpatrick


ATTORNEY FOR THE BOARD

M. Caylor, Associate Counsel


INTRODUCTION

The Veteran had active naval service from November 2001 to November 2005. 

This appeal to the Board of Veterans' Appeals (Board) is from February 2009 and August 2013 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Louis, Missouri. 

The Board previously denied the service connection issues in June 2013. The Veteran appealed the June 2013 decision and the United States Court of Appeals for Veterans Claims (CAVC). The CAVC granted a Joint Motion for Remand. In June 2014, the Board remanded both the increased rating and the service connection issues for additional development.


FINDINGS OF FACT

1. Fibrosing mediastinitis had its onset during active service.

2. Meralgia paresthetica and inflamed right sacroiliac joint had its onset during active service.

3. The Veteran's migraine and tension headaches combined more closely approximate very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. 


CONCLUSIONS OF LAW

1. The criteria for entitlement to service connection for fibrosing mediastinitis have been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

2. The criteria for entitlement to service connection for meralgia paresthetica and inflamed right sacroiliac joint have been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

3. The criteria for an initial disability rating of 50 percent for migraine headaches have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.321, 4.3; 4.124a, Diagnostic Code 8100 (2015).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Service Connection Claims

Service connection means that a veteran has a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303(a). Service connection may be granted for any disease diagnosed after discharge when the evidence shows that the disease was incurred in service. 38 C.F.R. § 3.303(d). 

Entitlement to service connection is established when the following elements are satisfied: (1) the existence of a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship or "medical nexus" between the current disability and the disease or injury incurred or aggravated during service. Holton v. Shinseki, 557 F.3d 1363, 1366 (Fed. Cir. 2009) (quoting Shedden v. Principi, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004)); see 38 C.F.R. § 3.303(a). 

For the chronic diseases listed in 38 U.S.C.A. § 1101 and 38 C.F.R. § 3.309(a), if the chronic disease manifested in service, then service connection will be established for subsequent manifestations of the same chronic disease at any date after service, no matter how remote, without having to show a causal relationship or medical nexus, unless the later manifestations are clearly due to causes unrelated to service ("intercurrent causes"). 38 C.F.R. § 3.303(b); Walker v. Shinseki, 708 F.3d 1331, 1338 (Fed. Cir. 2012) (holding that § 3.303(b) only applies to the chronic diseases listed in § 3.309(a)). When the condition noted during service is not shown to be chronic, or its chronicity may be legitimately questioned, then a continuity of symptoms after service must be shown to establish service connection under this provision. Id.; Walker, 708 F.3d at 1338-39 (observing that a continuity of symptoms after service is a relaxed evidentiary showing that itself "establishes the link, or nexus" to service and also "confirm[s] the existence of the chronic disease while in service or [during a] presumptive period"). To establish service connection based on a continuity of symptoms under § 3.303(b), the evidence must show: (1) a condition "noted" during service; (2) post-service continuity of the same symptoms; and (3) a nexus between the present disability and the post-service symptoms. Fountain v. McDonald, No. 13-0540 (Vet. App. 2015).

Fibrosing Mediastinitis

The Veteran filed his claim for service connection for fibrosing mediastinitis in August 2008. In his accompanying written report, he asserted he had no chest pain when he entered service, but in 2004 he had an abnormal x-ray. 

Service treatment records contain the September 2004 abnormal x-ray referenced by the Veteran. This scan revealed an increased opacity in the Veteran's right lower lobe; however his lungs were well aerated. Cardiomediastinal silhouette and bony and soft tissue structures were all normal. A medic read this radiology report and opined the subtle increased opacity was likely insignificant and may simply be related to the Veteran's body habitus. He explained the testing confirmed his lungs were well aerated and expanded. 

In his August 2005 report of medical history shortly before his separation from service, the Veteran reported frequent pain in his chest by his heart which made it hard to breathe. However, no diagnosis of a chronic chest condition was noted during the Veteran's military service.

After service, the Veteran was examined by Terrance Coulter, M.D. in September 2008. He was sent for evaluation of fibrosing mediastinitis. The Veteran stated that he had experienced episodic chest pain over the last five years. He stated that over the last two months, he had more frequent episodes of pain that had lasted much longer. He presented to the ER and work up included a chest x-ray that demonstrated a left nodule and right hilar mass. Subsequent CT scan confirmed this. The Veteran then underwent mediastinoscopy and biopsies were consistent with fibrosing mediastinitis. 

In January 2009, the Veteran was provided with a VA examination. The examiner reviewed the Veteran's claims file and medical record, as well as personally interviewed and examined the Veteran. The examiner opined the Veteran had fibrosing mediastinitis due to histoplasmosis. This examiner opined that he could not provide an opinion whether the Veteran's chest condition was due to his military service without resort to mere speculation. The examiner explained that the Veteran could have been exposed to histoplamosis, the source of his current fibrosing mediastinitis condition, at any time from breathing air in the southern United States, as well as his history of working around paint detailing cars before his military service.

The January 2009 VA examiner provided a January 2015 addendum opinion that the Veteran's fibrosing mediastinitis was most likely due to his history of histoplasmosis. The rationale was that fibrosing mediastinitis is a complication of histoplasmosis - many physicians believe it is an abnormal immunologic response to antigens release by the soil-based fungus Histoplasma capsulatum.

The VA examiner's opinion is inadequate, as it does not address the Veteran's reports of continuous symptoms since service, his assertion that he did not work detailing cars until after his separation from service, or his assertion that he could have gotten histoplasmosis from cleaning pigeon feces from missile containers, bombs, and bomb racks. See March 2011 Statement (reporting wearing respirator while working as a painter from June 2000 to December 2000 and working as a detailer from February 2008 to August 2009); October 2009 Statement (asserting that he wore a respirator while working as a painter, that his physician said histoplasmosis from breathing air is very minor and often overlooked in imaging, that his chest pains began prior to detailing cars starting in February 2009, that he wore a respirator while detailing cars, and that he did not wear a respirator while cleaning pigeon feces from missile containers, bombs, bomb racks, and storage containers); May 2002 and June 2002 Medical Questionnaires for Potential Respirator Users (reporting having previously worn a respirator for paint an dust and having chest pain only when breathing deeply and being expected to use a respirator in service for less than 5 hours per week doing light work effort). Further, the VA examiner did not address the significance of the Veteran's possible exposure to isocyanates and asbestos or his August 2008 Left Chamberlain procedure with biopsy. See September 2008 Ferrell-Duncan Clinic (reporting working in corrosion department in service, sanding down and repairing jets, and being exposed to asbestos); id. (diagnosing fibrosing mediastinitis, likely due to histoplasmosis, and recommending checking fungal serologies); September 2008 VA Treatment Records (HistoAb Serum Test negative for immunodiffusion and mycelial); August 2008 Ferrell-Duncan Clinic (planning Left Chamberlain procedure with biopsy due to left hilar mass found in chest imaging); id. (diagnosing left hilar mass in immunocompromised host, no fungi identified, but cultures from some sclerosing mediastinitis-like lesions yield Histoplasma or mycobacterium, so fungal serologies should be considered); September 2004 Lenmoore Naval Hospital (taking chest x-ray for baseline due to possible exposure to isocyanates from working in corrosion shop); id. (x-ray report abnormal, repeat x-ray ordered, "will wait for results before clearing for isocy[a]nate painting"); September 2004 Respirator Medical Surveillance (endorsing exposure to isocyanate foam or paint, but no abnormalities related to exposure to isocyanates with respirator). Thus, the VA examiner's opinion is afforded no probative weight. 

Here, the in-service x-ray in September 2004 showed an increased opacity in the Veteran's right lower lobe. During service in August 2005, he reported frequent pain in his chest by his heart which made it hard to breathe. During post-service treatment in September 2008, he gave a history of chest pain over the last five years, suggesting an onset of his symptoms during service. Given the in-service findings and complaints, the post-service diagnosis less than three years following his separation from service, and the Veteran's credible report of a continuity of symptoms at the time of his private evaluation in September 2008, the Board resolves doubt in the Veteran's favor and finds that his fibrosing mediastinitis had its onset during active service. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. Accordingly, service connection is warranted for fibrosing mediastinitis.


Right Thigh Disorder

The Veteran is seeking service connection for a right thigh condition, describing tingling and numbness in his right lower extremity. 

The service treatment records shows that in his August 2005 report of medical history, the Veteran reported experiencing a "closed off" nerve in his right thigh for four years, but that he was told he just damaged it. However, he stated that this condition continued to hurt. He described if he stood in one place for too long his right thigh went numb. 

The Veteran filed his current claim of service connection for right thigh condition in August 2008. In his accompanying written statement, he asserted that he injured his right thigh during basic training in 2001. He reported since that time he had experienced intermittent numbness and tingling in his side to the top of his thigh. He reported needing to constantly move his right thigh when this condition occurred to avoid severe tingling.

In October 2008, the Veteran established treatment with the VA facility. He reported a history of numbness and feeling of pins in his right thigh since boot camp. He reported being told his symptoms would abate with time, but they had continued to persist.

In January 2009, the Veteran reported to his private physician that his right-sided leg pain had gotten worse over the last several weeks. He reported first developing shooting pain in his right leg while doing sit-ups in boot camp in 2001. 

That same month, the Veteran was provided with a VA examination. The examiner noted the Veteran's history and complaints consistent with the record, including the Veteran's assertion that his right thigh condition began while performing sit-ups while wearing a large belt during basic training. The examiner opined the Veteran had neuralgia which caused neuropathy in his right thigh, but noted the etiology of this condition was unknown. The examiner opined he was unable to provide a nexus opinion regarding the Veteran's right thigh condition without resort to mere speculation. He explained that the Veteran had not reported any injury to his right thigh except for the sit-ups incidence in boot camp. The examiner opined sit-ups were not enough to cause permanent nerve damage. 

A VA examiner provided an addendum opinion in March 2015 that the Veteran's right thigh condition was less likely than not related to service because the Veteran did not report a significant injury. The rationale was that the examiner did not believe an injury while doing sit-ups in basic training would have caused the Veteran's significant medical issue. 

The examiner's opinion is inadequate, as it appears to disregard the Veteran's lay testimony regarding the specific circumstances of his injury during basic training, as well as his report that he had experienced the same symptoms intermittently since basic training. See March 2011 Statement (reporting intermittent chronic pain and numbness in right thigh since boot camp); October 2009 Statement (reporting injury during a "beating"-an extreme physical training session in full dress, including military guard belts-as punishment). Thus, the VA examiner's opinion is afforded no probative weight. 

Here, the evidence shows that the Veteran has a current disability, diagnosed as meralgia paresthetica and inflamed right sacroiliac joint. See February 2015 VA Treatment Records (noting a history of inflamed sacroiliac joint and finding that meralgia paresthetica was about the same); May 2014 VA Treatment Records (diagnosing meralgia paresthetica and including inflamed right sacroiliac joint in problem list); July 2005 Report of Medical Assessment (noting possible meralgia paresthetica involving right upper thigh). During service in August 2005, he reported experiencing a "closed off" nerve in his right thigh for four years, but that he was told he just damaged it. However, he stated that this condition continued to hurt. After service beginning in 2008, the medical evidence shows that he continued to seek treatment with consistent complaints and symptoms. Given the in-service complaints and the Veteran's credible report of a continuity of symptoms as reflected by his ongoing treatment beginning not long after service, the Board resolves doubt in the Veteran's favor and finds that his meralgia paresthetica and inflamed right sacroiliac joint had its onset during active service. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. Accordingly, service connection is warranted for meralgia paresthetica and inflamed right sacroiliac joint.


III. Increased Rating for Migraine Headaches

The Veterans Claims Assistance Act of 2000 (VCAA) describes VA's duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a).

Because the appeal concerning the initial evaluation of the Veteran's headaches stems from a granted service connection claim, the issue of whether there was adequate VCAA notice is moot, as the purpose of such notice was fulfilled with the grant of service connection. See Goodwin v. Peake, 22 Vet. App. 128, 137 (2008); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 

With regard to the duty to assist, the Veterans Benefits Management System (VBMS) e-folder contains the Veteran's VA treatment records and private treatment reports. The Veteran has not identified any other records or evidence he wished to submit or have VA obtain. Adequate VA examinations have also been performed, most recently in January 2015, that in conjunction include consideration of the Veteran's medical history and set forth clinical findings and opinions that enable the Board to make fully informed decision on this claim. See Stefl v. Nicholson, 21 Vet. App. 120, 123 (2007); 38 C.F.R. §§ 3.159(c)(4), 3.326(a), 3.327 (2015). 

In light of the above, the Veteran has had a meaningful opportunity to participate effectively in the processing of this claim, and no prejudicial error has been committed in discharging VA's duties to notify and assist. See Shinseki v. Sanders, 556 U.S. 396, 407, 410 (2009); Conway v. Principi, 353 F.3d 1369, 1374 (Fed. Cir. 2004); Arneson v. Shinseki, 24 Vet. App. 379, 389 (2011); Vogan v. Shinseki, 24 Vet. App. 159, 163 (2010). 

The Veteran contends that his migraine headache symptoms are worse than the currently assigned rating of 30 percent under Diagnostic Code 8100 reflects. See March 2015 Substantive Appeal; April 2014 Notice of Disagreement. 

Disability ratings are based on average impairment in earning capacity resulting from a particular disability, and are determined by comparing symptoms shown with criteria in VA's Schedule for Rating Disabilities (Rating Schedule). 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. Separate diagnostic codes identify the various disabilities.

In determining the disability evaluation, VA has a duty to acknowledge and consider all regulations, which are potentially applicable, based upon the assertions and issues raised in the record and to explain the reasons and bases for its conclusion. Schafrath v. Derwinski, 1 Vet. App. 589 (1991).

The Board will consider whether separate ratings may be assigned for separate periods of time based on facts found, a practice known as "staged ratings," whether it is an initial rating case or not. Fenderson v. West, 12 Vet. App. 119, 126-27 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007). The Board finds, however, that staged ratings are not warranted here, as the degree of impairment due to the Veteran's headache disability has not varied significantly during the appeal period. 

Where there is a question as to which of two evaluations apply, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

The Veteran's migraine headaches are rated under Diagnostic Code (DC) 8100. See 38 C.F.R. § 4.124a. Under DC 8100, a 50 percent rating is assigned for migraines with very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. Id. A 30 percent rating is assigned for migraines with characteristic prostrating attacks occurring on an average of once a month over the last several months. Id. 

VA regulations do not define "prostrating"; nor has the CAVC. Cf. Fenderson v. West, 12 Vet. App. 119 (1999) (quoting Diagnostic Code 8100 without addressing the definition of a prostrating attack.). According to MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 999 (11th Ed. 2007), "prostration" is defined as "complete physical or mental exhaustion." A similar definition-"extreme exhaustion or powerlessness"-is found in DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1554 (31st Ed. 2007).

VA regulations also do not define "economic inadaptability"; however, the CAVC has noted that nothing in Diagnostic Code 8100 requires the Veteran to be completely unable to work in order to qualify for a 50 percent rating. See Pierce v. Principi, 18 Vet. App. 440, 445-46 (2004).

Medical and lay evidence shows that, despite periods of improvement, during the period on appeal the Veteran has had an average of approximately 2 two prostrating migraine attacks per month, lasting several hours in length, that are characterized by throbbing, pulsating pain worsened by physical activity, accompanied by neck stiffness, nausea, vomiting, and sensitivity to both light and sound that necessitates laying down in a dark and silent room. See March 2015 Statement (reporting prostrating an debilitating attacks of migraine headache pain 2 to 4 times per month for the prior 2 years, despite trials of several different medications, that require sitting in a silent and dark room and prevent him from taking a full semester course load, and which cause residual ongoing headaches that last several months); January 2015 VA Headache Examination (reporting more than 1 characteristic prostrating attack of severe pulsating and throbbing migraine head pain per month that last from 2 days to 2.5 months, despite prescription and over-the-counter medications, that are accompanied by nausea, vomiting, and light sensitivity and worsened with activity, and that require laying down in a dark room); November 2013 VA Treatment Records (reporting that current medication does "take the edge off," but does not help the headaches at all, especially the "big-hitting migraines"); January 2013 VA Headache Examination (reporting more than 1 characteristic prostrating attack of severe pulsating and throbbing migraine headache pain per month that worsens with activity and is accompanied by nausea, changes in vision, and sensitivity to light and sound); March 2009 Notice of Disagreement (reporting intense headaches on a monthly basis that are accompanied by light sensitivity and nausea that keep him in bed all day); October 2008 VA Treatment Records (reporting episodes of headache pain from 1 to 8 times per month and migraine headaches about 1 to 3 times per month, despite using both prescription and over-the-counter medication, which produce constant throbbing pain at the back of the neck and the frontal area and are accompanied by nausea, vomiting, and photophobia). 

The evidence also shows that the Veteran has been diagnosed with tension headache, which he reported last for several months following migraine attacks, such that that there has been almost no day during which he has not had headache. See March 2015 Statement (reporting residual headaches that are ongoing post-migraine attack and last for several months at a time, such that, with migraine attacks occurring 2 to 4 times a month, there is rarely a day that headache is not present); January 2015 VA Headache Examination (diagnosing both migraine headache and tension headache); October 2008 VA Treatment Records (reporting episodes of headache pain from 1 to 8 times per month in addition to migraine headaches, despite using both prescription and over-the-counter medication). 

The January 2015 VA examiner found the Veteran's headache condition impacted his ability to work. The rationale was that the Veteran was unable to do anything during a severe headache except go into a dark bedroom and stay in bed, and his prescription medication could only get his headaches to a "tolerable" level. 

The Veteran is competent to report his symptoms and functional limitations, having to take time off of work, having to take less than a full schedule of coursework despite being a full-time student, and having to isolate himself in a silent and dark room several times a month due to migraines. His statements are credible and entitled to probative weight. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007). 

Taken together, the Board gives the finding of the January 2015 VA examiner that the Veteran was essentially not able to function during a migraine attack, and the Veteran's statements that he had frequent prostrating migraine attacks and residual tension headache when he was not having an attack, great probative weight.

While the July 2013 VA examiner found the Veteran's headaches did not impact his ability to work, the Board gives more probative weight to the January 2015 VA examiner's finding that the Veteran's headache condition did impact his ability to work. The July 2013 VA examiner appeared to ignore the Veteran's competent, credible, and probative statements regarding the impact of his headaches. See January 2015 VA Treatment Records (reporting that medication for headaches makes him sleepy and interferes with coursework and headache pain wakes him up during the night); January 2015 VA Neurology Treatment Records (reporting increase and worsening of "blinding" migraine headaches, accompanied by nausea, vomiting, scintillating scotoma, diffuse weakness, and lightheadedness, upon starting school for information technology in August 2014); October 2014 VA Neurology Treatment Records (noting that increase in headaches may be due to overuse of nonsteroidal anti-inflammatory drugs (NSAIDs) to treat head pain); September 2014 VA Appointment Inquiry (reporting that more frequent migraines-3 per month, resulting in essentially 2 to 15 days of pain-make it difficult to focus and function to accomplish school work); July 2013 VA Headache Examination (reporting that the prescribed and over-the-counter medications taken had been only minimally or somewhat effective in controlling migraine headaches); March 2009 VA Treatment Records (reporting that his migraine headaches have been horrible, causing him to miss work for 3 days); Gabrielson v. Brown, 7 Vet. App. 36 (1994) (holding that the Board may give greater probative weight to one examiner's opinion over another's based on its reasoning and whether prior clinical records or other pertinent evidence was reviewed).

Accordingly, the Board resolves all reasonable doubt in the Veteran's favor to find that his migraine and tension headache symptoms produce symptoms and functional limitations that have more nearly approximated severe economic inadaptability. See 38 C.F.R. §§ 4.3, 4.7.

The Veteran is currently in receipt of the maximum disability evaluation available for his disability. 38 C.F.R. § 4.124a, Diagnostic Code 8100. The Board has carefully reviewed the rating schedule and finds no other Diagnostic Code that would provide a basis to grant a higher evaluation for this disorder, given the nature and location of his disability. See Butts v. Brown, 5 Vet. App. 532, 539 (1993) (holding that the Board's choice of diagnostic code, if supported by explanation and evidence, should be upheld). 

The evaluation of the Veteran's headache disorder does not warrant referral for extraschedular consideration. See 38 C.F.R. § 3.321(b); Thun v. Peake, 22 Vet. App. 111, 114 (2008); aff'd, Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009). In this regard, because the ratings provided under the VA Schedule for Rating Disabilities are averages, it follows that an assigned rating may not completely account for each individual veteran's circumstances, but nevertheless would still be adequate to address the average impairment in earning capacity caused by the disability. Thun, 22 Vet. App. at 114. However, in exceptional situations where the rating is inadequate, it may be appropriate to refer the case for extraschedular consideration. The governing norm in these exceptional cases is a finding that the disability at issue presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards. 38 C.F.R. § 3.321(b)(1). These criteria have been broken up into a three-step inquiry, each element of which must be satisfied: (1) The criteria must be inadequate to describe the claimant's disability level and symptomatology; (2) There must be related factors such marked interference with employment or frequent periods of hospitalization; (3) If so, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for a determination of whether the claimant's disability picture requires the assignment of an extraschedular rating. Thun, 22 Vet. App. at 114. 

As Diagnostic Code 8100 applies to headaches -specifically, migraine headache - and the symptoms and limitations that come together to produce "characteristic prostrating attacks" are not specifically delineated, the diagnostic criteria reasonably contemplate all of the Veteran's reported symptoms. Specific symptoms are not mentioned in DC 8100; however, this intentional decision not to delineate specific symptoms indicates that the presence of one or more such symptoms is assumed, and that the evaluation turns not on the particular symptoms the claimant has but rather on their functional effects - namely prostrating attacks. See 38 C.F.R. § 4.1; 38 C.F.R. § 4.21 (2015) (providing that application of the rating schedule requires "coordination of rating with impairment of function"). Accordingly, the symptoms and functional impairment caused by the Veteran's migraine headaches and tension headaches (i.e., pain, nausea, vision disturbance, sensitivity to light and sound) are adequately contemplated by the schedular criteria as discussed above. See also DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1183 (31st Ed. 2007) (defining "migraine" as a "symptom complex of periodic attacks of vascular headache . . . commonly associated with irritability, nausea, vomiting . . . and often photophobia"); id. at 835-836 (defining "tension headache" as "affecting especially the occipital region [and] usually continuous for weeks or months"). As the available schedular evaluations are adequate to rate this disability, the first step of the inquiry is not satisfied. In the absence of this threshold finding, the second step of the inquiry, namely whether there are "related factors" such as marked interference with employment or frequent periods of hospitalization, is moot. See Thun at 118-19. Therefore, the Board will not refer the evaluation of the Veteran's headache disorder for extraschedular consideration. 38 C.F.R. § 3.321(b). 

Further, the Board notes that under Johnson v. McDonald, 762 F.3d 1362, 1365-66 (Fed. Cir. 2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. In addition to migraine headaches, the Veteran is in receipt of service connection for other disabilities including gastroesophageal reflux disease, a scar on his left check, and now fibrosing mediastinitis and meralgia paresthetica and inflamed right sacroiliac joint. Because the only increased rating claim on appeal at this time is for migraine headaches, that is the only disability that the Board is considering in the extraschedular analysis with respect to considering the collective impact of the disabilities. See id. 

Finally, a claim for a total disability rating based on individual unemployability (TDIU) is raised if a Veteran: (1) submits evidence of a medical disability; (2) makes a claim for the highest rating possible; and (3) submits evidence of unemployability. Rice v. Shinseki, 22 Vet. App. 447 (2009); Roberson v. Principi, 251 F.3d 1378 (Fed. Cir. 2001). In this case, the record does not contain evidence of unemployability. Here, the Veteran did not appear to stop working in April 2012 due to his service-connected migraine and tension headache; instead, he stopped working to enroll full-time in courses as a student. Further, during his July 2013 VA examination, the Veteran reported that that he had worked full-time for a body shop during the 4 years prior to the end of his employment in April 2012 and, while he reported interference with his full-time educational program from the summer of 2012 to the present, the Veteran has not asserted that he has been unable to complete his educational program or obtain a job due to his headaches.


ORDER

Entitlement to service connection for fibrosing mediastinitis is granted.

Entitlement to service connection for meralgia paresthetica and inflamed right sacroiliac joint is granted.

An initial disability rating of 50 percent is granted for migraine headaches, subject to the statutes and regulations governing the payment of VA compensation.



______________________________________________
P.M. DILORENZO
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs